ORAL ARGUMENT IS EXCEEDING 40 MINUTES FOR THE APPELLEES AND 40 MINUTES TO BE SHARED BY THE APPELLANTS. MS. BETTENHAUSEN, YOU MAY PROCEED FOR APPELLANTS RICHARD DALE SNYDER, ET AL. Good afternoon, your honors. This is Assistant Attorney General Margaret Bettenhausen. I am here on behalf of Governor Gretchen Whitmer, former Governor Rick Snyder, and former State Treasurer Andy Dillon. I have been allocated a total of 16 minutes of appellants 40 minutes. I would like to reserve three minutes for my rebuttal. May it please the court. The District Court's Qualified Immunity and 11th Amendment Immunity Ruling should be reversed for two primary reasons. First, the Qualified Immunity Ruling should be reversed for the same reasons that the high-ranking officials, including Governor Snyder, were dismissed in Girton. Plaintiffs' own allegations show that the information available to Governor Snyder and Treasurer Dillon was complex and contradictory. Second, choosing between difficult policy options does not show deliberate indifference or violation of a clearly established constitutional right. Even if those choices turn out to be gravely wrong in hindsight, Qualified Immunity gives government officials breathing room to make mistakes in judgment. Second, the District Court's 11th Amendment Immunity Ruling should be reversed because, unlike in the Bowler case, here the District Court put parameters on the alleged constitutional violation and held that it occurred entirely in the past. Therefore, this case is different than Millikan 2 and Gary B. In both of those cases, plaintiffs alleged an ongoing violation of federal law. Here, plaintiffs allege only ongoing effects of a past violation. It is black-letter law that under Ex parte Young, ongoing effects is not enough. As a result, this court simply lacks jurisdiction to enter injunctive relief against Governor Whitmer. I will start with deliberate indifference. In Girton, the high-ranking state officials were all dismissed because their involvement with the water treatment decisions was too tenuous to show deliberate indifference. Governor Snyder, DEQ Director Lyon, DHH Director Lyon, and Chief Medical Executive Wells were all dismissed in Girton. This court should reach the same conclusion in this case. This is Judge Moore. Were there any different allegations in this case as contrasted with Girton? This is Eric Murphy. Judge Murphy, why don't... How does that... That's an argument that was made in Girton as well with respect to the emergency managers who are also not experts on the science of this. And the court still allowed the claims against the non-expert emergency managers to proceed. So why, in some respects, wouldn't the governor be analogous to the emergency managers? Both claims, I suppose, are that they did not come from disclosed information that they knew that was harmful. So I wonder if you could respond. So what I'm really getting at is, in Girton, they allowed some claims to proceed. They kicked other claims. Why shouldn't we view the claim against Governor Snyder to be analogous to the claims against the emergency managers that were allowed to proceed? It's because of the connection to the water treatment decision. The allegations against the emergency managers establish they're involved in the day-to-day operations of the water plant. That's very similar to the water engineers, Veolia and Land, and very similar to the individual NDEQ regulators. Those are all individuals that dealt with the day-to-day operations. Unlike those individuals, these high-ranking officials, Director Wyant, the governor, they were not involved in the day-to-day operations. Plus, there's additional allegations with respect to the emergency managers, such as they made statements about the water's safety. There is no allegation that Governor Snyder ever made any statements to the public about the water's safety. And that's actually an error in the district court's opinion on page 46. The district court held that he's liable because he publicly denied there were water problems. There is absolutely no allegation in the complaint that he didn't make any statements about the water's quality. So, that is what differentiates Governor Snyder from the emergency managers. And the fact is, the plaintiff's own allegations established that, in addition to the emergency managers, the water engineering experts and the individual NDEQ regulators were all saying publicly that the water was safe. There's numerous allegations throughout the complaint of them directing this information. And given that these were the experts that were at the plant, they were closest to the water treatment decisions, and they should have had the best information. So, it can't be, you know, to have deliberate indifference, you have to show callous disregard of a substantial, excuse me, an excessive risk to public health and safety. When all of these experts were saying to the public the water is safe, and Governor Snyder decides to accept that advice, that can't show callous disregard based on the allegations in this complaint. And the same goes, it's true for Treasurer Dillon, and I don't want to spend too much time, excuse me, too much time on Treasurer Dillon for the reasons that are outlined in our 28-J letter. We think that those reasons warrant his dismissal, and basically, in the recent Brown decision, the district court, the same judge that ruled in this case, decided that she made an incorrect ruling with regard to Treasurer Dillon, and that he should have been dismissed in this case because he left office before the water switch was finalized. Again, it shows that his connection to the water treatment decisions was too tenuous to show a callous disregard. But even if he hadn't left before the switch, the allegations do not show that Dillon acted with callous disregard because he acted on the advice of others. Specifically, Treasurer Dillon, much like Governor Snyder, he's not a water treatment expert. He's an accountant. It's not his role to determine if water can be safely treated, similar to Governor Snyder. Instead, he relies on others, and who is he relying on? In paragraphs 107 and 119 of the complaint, it says that plaintiffs actually alleged that Director Wyant approved the decision to switch water sources, and that is the approval that Dillon acted on. Excuse me, this is Judge Moore. I'm a little bit confused about the timing that you're arguing. Did Dillon recommend to Snyder that he authorize the switch to Flint River water? Dillon did ultimately approve it, but the allegations in paragraphs 107 and 119 of – I mean, keep in mind, Dillon is an accountant. Yes, but my question was not what basis he might have had. I thought you said he left office before the switch, but then you said that he did approve it. So he approved it, and then he left office? Is that your position? Right, exactly. He was working with Director Wyant at the time, and it says in paragraphs 107 and 119 that Director Wyant, who is the director of the Department of Environmental Equality at the time, approved it, and along with his approval, he made a recommendation to go along with the switch. Now, as outlined in our 28J letter, it's clear based on the public records that Dillon actually left office before the water switch happened. So his involvement with any water treatment decision just didn't happen. So at this point, the district court feels that it should have dismissed him. And I want to turn to the clearly established issue, which is closely related. As we know, a right is clearly established when every reasonable official would understand what he was doing would violate that right. And just to clarify real quickly, we can see that this court in Girton held that a bodily integrity violation could occur in the context of water contamination, and we're going to rely on our briefs to preserve that argument, so I don't want to spend too much time on that. What I want to argue today is looking at each defendant's individual conduct shows that neither Snyder nor Dillon had fair warning that their specific conduct was unconstitutional. I'm curious about Governor Widmer. If we were to agree with you about Governor Snyder, would that mean that Governor Widmer would have no ongoing responsibility, is part one of the question. And the second is, what is your best case on this effects doctrine that you seem to be espousing as a limit on ex parte Young? The allegations against Governor Snyder, it's actually two distinct things. So even if Snyder had a past violation, that doesn't mean that ex parte Young relief would be provided, so no would be the answer to your first question. The ongoing effects, I believe we cited Green v. Monsure in our case. It's very similar. During that case, basically the plaintiffs were alleging that they had been wrongly denied benefits in a way that violated federal law. And during the course of that case, the state opted to change how it would apply that law to comport with federal law. And what the court held was since they were now enforcing that law in compliance with federal law, they couldn't go back and award the benefits wrongly withheld in the past in a way that it violated federal law because the federal law was no longer ongoing. And the same is true here. It's certainly the same in Green v. Monsure. The past effects of that previous violation of federal law left a harm on those plaintiffs that did not get their benefits. They still didn't have their benefits, but the federal court was without authority, without jurisdiction to award those. And what they told the plaintiffs they needed to do is go seek state remedies in that situation. And that's exactly what the 11th Amendment preserves. And so I just want to turn back real quickly to you. I think your time is pretty much up, but you did save three minutes for rebuttal, which you can use now if you wish or in rebuttal. I'll save my remaining time for rebuttal. Thank you, Your Honor. Mr. Barbieri? Yes. Charles Barbieri on behalf of MDEQ, defendant appellants Patrick Cook, Michael Prisby, Stephen Bush, Leanne Schechter-Smith, and Bradley Warfel. We are requesting reversal based on the qualified immunity that applies to their actions as MDEQ employees. Without waiving the arguments in our brief for supplemental authority, let me focus on just a few issues, and particularly on Patrick Cook. Mr. Cook, an employee of the Michigan Department of Environmental Quality, he has been dismissed in the Girton case, which was referenced by Sister Counsel, and also in the Brown case, which I've referenced in supplemental authority submitted to your honors. We submit that in the Carson-Wade case that the circumstances of the allegations do not show that he either created or perpetuated any alleged exposure by any conscious, shocking conduct. First, the only allegations that apply to him relate to whether he somehow misled the EPA about the use or need of corrosion control chemicals. Quite frankly, the only document that verifies his involvement in communications with the EPA reveals that he actually disclosed to the U.S. EPA that there were no corrosion control chemicals in use. Judge Murphy, would you agree that if we had thought that they plausibly stated a claim that he intentionally misled the EPA, that under Girton that would rise to the level of conscious, shocking behavior, adequately stating the claim, and overcoming qualified immunity? No, I don't believe so, because you have to keep it in context. Certainly, he believed that you only needed two six-month rounds of lead testing results from residential drinking water supplies. But in communicating that to the particular EPA employee here, that EPA employee, both before and after, still held to the view that the lead-copper rule required that corrosion control chemicals could be used. It's implausible to suggest, in our view, that there was any need of corrosion control chemical misrepresentation there being shown. We submit that the agency was not dissuaded from that view, notwithstanding Cook's statement. So, Cook, taking the position that he did, he was forthright. He told them they weren't using it and explained why. Now, this is reinforced by what you can take judicial notice of, and that's the U.S. EPA's November 3, 2015 memorandum, which clearly acknowledges that the MDQ's position was one that was a reasonable interpretation. Certainly, in hindsight, the U.S. EPA has taken the position that that will no longer be a reasonable interpretation, but those factors together show an implausibility that there was somehow any action by Cook to mislead. Now, the only other allegation related to Cook is the fact that he signed the permit as a reviewer before the water switch occurred. And, quite frankly, that's not tied to any allegation that Cook knew about any risk posed by the treatment of the Flint River water. There's nothing to make that connection in front of the allegations that are present here. So, for that reason, we submit that the district court erred in finding that there was some conduct that was conscience-shocking. There is not in the case of Patrick Cook. Let me turn briefly to the other defendants. Let me just focus very briefly on Mr. Werfel. He is a spokesman. His connection, we submit, is very tenuous in the sense that his statements all relied upon experts and those that are in the field of lead, copper, wool. His statements merely followed the practice of listening to what department personnel and staff provided and disseminating that. Judge Murphy, please go ahead. I was just going to ask, I know that Mr. Werfel was in the other case and the Sixth Circuit said that they stated a claim. How would you distinguish that case with respect to the same party? Well, that's an interesting issue. We believe that they misunderstood the import of the Second Circuit cases that were cited to the court and are also at issue here. In other words, this is Judge Moore. In other words, we would have to effectively, as one panel, overturn Gorton because you're saying Gorton is wrong as opposed to saying that the allegations in this case are any different. Well, I think Gorton is wrong for several reasons, among those being the one you just mentioned, Your Honor. And I suspect that your point is that was argued before it was argued in part. I concur in that assessment. And certainly that's true of the other defendants too. They've made similar points with Bush, Prisby, and Schechter-Smith. However, I would invite you to really analyze it in their particular instances that the allegations are not the same as in Gorton. I submit them in the case of all three of those additional defendants that the allegations are not as significant or as lengthy as those that were in the Gorton case as found here. I see my time is up. Thank you. I have two minutes in rebuttal.  Mr. Fagin? Yes, this is Jim Fagin. I represent Adam Rosenthal and respectfully request that the district court's ruling be reversed. As my brief has shown, Mr. Rosenthal is a water analyst. And essentially what his job is is he gets the data from the city, and he analyzes it to make sure that it complies with the copper and lead rule. Now, in analyzing the results that he received from the city, several of the results did not comply with the copper and lead rule. And that's a rule that he had followed for the entire 17 years he had worked in that department. And that rule requires that it has to be a single-family residential property, and the test has to be taken from either a bathroom or a sink in the kitchen, and it cannot be taken from a business site. Now, the two samples that he rejected did not comply. The one was from a business, and the second one was from the basement entry. So on that basis, he had to reject those two samples. Now, he has, I think he testified, he had over 190 municipalities and systems that he took care of. And every one of them, and I shouldn't say every one, but on numerous occasions, samples did not comply. And according to the rule, they have to be rejected. Now, as far as his bid for qualified immunity, the district court judge did not really come out in her finding with any real example of any deliberate indifference or duplicity that can be ascribed to Mr. Rosenthal. He is probably the lowest employee on the scale here. He's merely doing his job that's been assigned to him. He has a duty to comply with the rules of the lead and copper rule, and he did so. And on that basis, I don't see any way that the court can hold that there was any deliberate indifference or active duplicity. So I feel he fully comes in and complies with qualified immunity. This is Judge Murphy. I was curious if I could ask just briefly, I don't want to waste too much of your time, a jurisdictional question. I noticed that you filed your notice of appeal well over 30 days after the order, and I was wondering if that affected our ability to actually hear the appeal, because the way I understand the rules work is the filing a timely notice of appeal is an absolute jurisdictional requirement. And I saw you filed your notice of appeal on May 14th, and the order was April 1st. I wonder if you actually know. I don't mean to put you on the spot, but I felt I had filed it timely. I've always accepted this as a timely appeal. It was accepted by the court. I thought I hit the deadline right on the date it was due. Okay. Well, I thought the order was April 1st, and I saw your notice of appeal being filed May 14th. And I think it's 30 days. Maybe I'm mistaken on that. Yeah, and again, I thought it was timely. Well, thank you for your argument. I think you've used your time for argument, and certainly we'll look into that question. Okay. Thank you. Mr. Zaney? Yes. Good afternoon. Edward Zaney on behalf of Doherty Johnson, the City of Flint individual descendant. I have eight minutes, and I respectfully am reserving one minute for rebuttal. Just also to be clear, Glasgow and Johnson were not named in Weirton, and that's why we're pursuing this appeal here. And I think this appeal present before the panel, and respectfully may it please this Honorable Court, that I think this appeal is driven by a case that says we cannot ascribe the acts of all individual descendants to each individual. And I think that complements – that's Hanes v. Metropolitan Nashville Public Schools. And I feel it really complements what Weirton requires. Now, we have five questions presented in our brief. We reserve and obviously preserve those arguments, but I think today's argument needs to really focus on the 12B-6, whether or not they stated sufficient factual allegations in the complaint to show a right to relief. And I think this complements – that case complements Weirton in that it requires the assessment of each individual's awareness of the substantial risk of serious injury. And what we're going to see in the complaint here is that as far as Johnson and Glasgow, it fails to do that. Specifically, I think that's the driving force behind what plaintiffs seek and where the district court erred in Mr. Novo's review. I think they took a lot of facts and said we're going to impute knowledge on others, though it's not alleged. Understanding reasonable inferences are appropriate, they must be reasonable, and they must be driven by the factual allegations as presented. And as what we have in this case, specifically, timing, action, and knowledge. What action was taken when with what knowledge? I look into what is alleged in the complaint. Johnson is very skeletal in the body of the complaint, but there's two bookends that I think relate to date. That's June of 2013, where the city of Flint retains the services of land. And that's paragraph 151. And it says they retained land of the professional engineering firm to assist with the Flint water KWA pipeline. That's a summation of paragraph 151. The other bookend in this case I think is driven by paragraph 251, which states as far as March 10, 2015, defendants knew that the extreme public health emergency involved lead poisoning, deadly Legionella bacteria, and a host of other ailments. Because that, to me, is the bookend of time, I want to consider what happened after March 10 as alleged and what actions these individuals took prior to March 10 between 2013 and March 10. Simply and noticeably absent from the complaint is any allegation that action was taken by Doherty Johnson after March 10, 2015. So there's nothing specifically stating that he had knowledge and took action with that knowledge. What we have is simply, again, a skeletal position that the information contained in the brief is that, in the complaint, is that at paragraph 129, Michael Glasgow had sent an email to MDEQ. Again, in summation, this paragraph references he sent it to MDEQ. It does not assert that he did send that to the city of Flint Doherty Johnson defendant. It says that he would follow up with them, but nothing is alleged in the complaint saying that he did, in fact, follow up with them. Again, this information is that Doherty Johnson pressured Michael Glasgow to make this switch. That was the email, and there's an allegation. Pressuring someone is distinctly different than forcing the switch. But moving forward, everything was done with land in conjunction with the state to give one specific knowledge that the water was safe. The actions in which Mr. Glasgow took at the time in which he took them was based on the knowledge that the water was safe, because of land, as alleged in the complaint, providing this information, and MDEQ's approval and oversight. Again, contained within the four corners of the complaint. Well, I think also of most note is that Veolia is introduced in this complaint at paragraph 163, and at 194 it says Veolia defendants were tasked to review Flint public water system, including treatment process, maintenance procedures, and actions taken. As a water treatment professional, Veolia defendants had the opportunity to catch what land defendants had missed or refused to warn about. Again, putting it into the bookends of time, there's nothing indicating that land actually told city of Flint, specifically Doherty Johnson or Michael Glasgow, that things were not safe. There was no way he had facts available to him which he could infer substantial risk of serious harm. Are you saying that the only way to get information was from land? No, I could have gotten it from DEQ. What I'm saying is that based on the four corners of the complaint, there's no allegation that Doherty Johnson had specifically knew of facts which could infer the substantial risk of harm, and that coupled with that, he did infer it, and then acted with the indifference towards the individual right. The only information, what I'm driving at is what's actually contained in the complaint are land, Veolia, and DEQ. All were saying this information. I don't believe there's an allegation to contrary as it's assessed in the acronym of TAC, Timing, Action, and Knowledge. Clearly, after the March 10th, the date it's alleged that people knew about this. Prior to that, there's no allegation. Now, I'd just like to touch, there's also an indication of a press release, a FOIA. The press release, there's no allegation the press release was actually issued. There's no indication that the plaintiff relied on that press release or that as a result of that press release, they sustained injury. The FOIA, again, there's no indication that Johnson, no allegation that Johnson knew of any delay in responding to the FOIA would cause any harm to anyone or that Johnson's alleged delay in responding to the FOIA actually resulted in injury, which leads us to the failure, the blatant failure, and I think the requirement that causation be pled. The law requires causation, a causal connection between the actions of an official, the injury of the plaintiff, Sheets v. Mullins. They fail to allege causation specifically as to Doherty Johnson. Johnson's alleged pressure that his pressure resulted in actual switch or that he had the ability to make the switch or decide on the switch or, in fact, the opposite, to stop the switch. And that's the big challenge in summation as far as causation. That serves true also with Mr. Glasgow from his perspective. The information available to these individuals only show that the matters were safe and that cannot sustain any and there is absolutely no allegation whatsoever that these individuals, Johnson and Glasgow, knew of facts from which they could infer substantial risk of serious harm and that they'd, in fact, infer it. Mr. Zaney, this is Judge Merrick. Could I ask you what is the current status of the Gorton case now? What is it? It's back from the Supreme Court as I understand it. Is that right? That is my understanding, sir. It was denied and it's back in the district court. Again, we were not named, both Glasgow and Johnson were not named in that, in the Gorton case. And I think the facts from Gorton are distinguishably different from what's alleged in Wade. So you were not – I thought Glasgow was in Gorton but was dismissed by the district court. Am I wrong? Mr. Marker's up next to specifically address Glasgow, but it's my understanding that both Johnson and Glasgow were not entertained under the appellate. They had no appellate mandate from Gorton and that they were not included. You may, Your Honor, be accurate. I'll reserve that for Mr. Marker. Okay. So the only person you're representing is Doherty Johnson? Yes, Your Honor, and I took a little bit of extra time because I think they kind of connected in a very appropriate spot as to what information was available to these individuals. Mr. Marker specifically runs Mr. Glasgow. Okay. Thank you. Thank you. We'll hear from Mr. Marker now. Yes, good afternoon and may it please the Court. This is Christopher Marker speaking on behalf of appellate Michael Glasgow, city of Flint – or former city of Flint employee. And the Court is accurate that Mr. Glasgow was originally named as a defendant in the Gorton matter. The district court dismissed him finding that he had not violated any clearly established law by sending an email stating that if water was distributed from the plant in the coming weeks, it would be against his direction. And, therefore, this court had not addressed his right to governmental immunity, and that's what we're here to discuss today. We're requesting reversal based upon entitlement to governmental immunity for the following reasons. To begin, the allegations on the face of the complaint or based upon the allegations on the face of the complaint, the plaintiffs have failed to state a claim that he was deliberately indifferent to their right to bodily integrity in order to prove that his actions were of the type that shocked the conscience. Rather, he showed deference to these rights when he, as the plaintiffs allege, notified the DEQ, his regulators, that the plant was not ready to begin operation. Then, following the switch, as the plaintiffs allege, Mr. Glasgow tested for lead and copper and reported his findings to the DEQ. Finally, as noted earlier in argument today, two samples were rejected from what he had reported. He reported those samples nonetheless because he reported what he received, but these were not removed by Mr. Glasgow. Instead, they were removed at the specific direction of the MDEQ, and that's found in the allegations in the complaint as well. So even accepting all of these allegations as true, there's nothing as to Mr. Glasgow to demonstrate an indifference or callous disregard towards the plaintiff's rights. Further, as Mr. Zaney stated, there's no causal connection on the face of the complaint between the actions of Mr. Glasgow and the damages alleged by the plaintiff. I'd otherwise rely upon the arguments that I put forth in the briefing and those from Mr. Zaney. If the court would like, I can specifically go over the factual allegations in the complaint, but I've outlined those in the briefing. Otherwise, I'd reserve any extra time or ask the court to entertain any questions at this time if there are any. Do any of the judges have questions? Go ahead, Judge Barrett. Mr. Marker, in how many cases has Glasgow been named as a defendant? Your Honor, I don't have an accurate count at this moment. I can't say for certain. I can tell you that it is many, and the allegations contained in this complaint, this is the, I believe, third or fourth time that it's been amended to incorporate additional allegations. This is the most encompassing that has been heard by this court to date. As I had previously stated, this is our first time seeking appellate relief. But I apologize. I do not have an accurate number, and I don't want to speculate on that. I can represent to the court that it is many complaints that he has been named in. Many and now just a few. Okay. Thank you. Judge Murphy, did you have a question? I was just going to ask briefly. It seemed to me the most concerning allegations were the ones about telling residents to flush their water, to manipulate the test. I wonder if you could respond to that a little bit. Certainly. So, Mr. Glasgow, I reviewed the complaint, and I don't know that there is a specific factual allegation that him specifically stating that he had instructed the plaintiffs to do so. But if he did, and there's already been testimony to this effect, but essentially it was based upon the information that he received from the MDEQ. It's a sheet that came from the MDEQ, and I do believe that it's alleged elsewhere in the complaint, and I can't point you to a specific paragraph number. But what he did is he used a sheet that can be found on the MDEQ's website and was later amended after the date of this, after everything that is being litigated here was brought to light. It was based upon those specific instructions from the MDEQ. Thank you. I guess Mr. Young is not arguing. So, I mean, Mr. Kim is not arguing. So we are true, am I correct, with the appellant? Correct, Judge Moore. Correct. My sheet says he's available for questions. Yes. He is available for questions, Your Honor. Yeah, well, if I could get him to answer a couple of questions for me. Mr. Kim? Yes, Your Honor. This is City Attorney William Kim for the City of Flint here. What is the current status of the Gritton case? Do you know? Of the Gwerton case, Your Honor? Yes, Gritton case. The Supreme Court denied cert on that case earlier this year, and so essentially the city is proceeding with discovery, as are the other parties in that case, with the intention that we would be filing a summary judgment motion in appropriate time. And how many cases has the City of Flint been named as a defendant? Do you know? Well, Your Honor, at the risk of being slightly humorous, the answer is almost all of them. I believe there are well in excess of 60 or 70 different cases. Most of those cases are individual plaintiffs in which there are tens, dozens, if not hundreds of plaintiffs in the individual case. Do you happen to know how many cases have been filed in this Moore situation? I cannot give you a precise number off the top of my head here, Your Honor. I can tell you that it's well in excess of 50 or 60 cases that, as I mentioned, that includes one purported class action and that includes, with the rest of the cases that are individual cases, they're mass action type cases with significant numbers of plaintiffs in each individual case. Well, with all those cases, how does Judge Levy plan to handle so many cases? Has that been discussed among counsel as to how all these cases are going to be handled? Have they been consolidated or what? Well, Your Honor, there were originally a number of potential class actions. Those potential class actions have all been consolidated into a single case here, which is the case here that's currently on appeal. The individual cases I believe that the parties in the court are preparing to proceed under a bellwether trial type structure where a certain number of individual cases will be selected and tried to a verdict to essentially inform the parties as to likely outcomes as to other cases and proceeding from that point. I'm not quite understanding how that is going to be done. Can you give me a little more detail on how this large number of cases is going to be tried? Well, I believe what we are doing is essentially among the parties trying to narrow down cases that we can select that are reasonably typical of the cases that are arising out of these circumstances with the intention that those cases that are selected will be tried first. They'll be consolidated and tried together? I don't believe that there is any current – there's no current motions for consolidations of the individual cases. Given the extremely fact-specific nature of the claims by each individual plaintiff, we would likely oppose any such consolidation just because, for one reason, the damages element is very specific towards each potential plaintiff. How one person – what injuries one person may have suffered as a result of this could be entirely different than a person who lives two blocks down the street. So we don't feel that consolidation is necessarily going to be the appropriate way to proceed here. So are you going to have to try 40 or 50 cases? Well, Your Honor, ultimately that's a possibility. As I mentioned, Your Honor, our intention is that after the close of discovery that we'd be moving for summary judgment before any trial would happen. Okay. Thank you. Thank you, Your Honor. Okay. So the counsel for the appellees is Mr. Bagenstos. Yes. Thank you, Your Honor. My name is Samuel Bagenstos, and I represent the appellees who are the plaintiffs in the consolidated Flint water cases – Flint water class actions, which is this case. And, you know, one little coda I just want to add to what Mr. Kim said. There are a number of cases. The class actions have essentially been consolidated in this action. Interim co-lead counsel and coordinating counsel have been appointed by the district court. For that, there are also a number of individual cases pending in state court. And so there's a lot going on. I will note that the district judge did also appoint a special master for, you know, a long time ago for the purposes of exploring how to resolve this. I don't have anything I can report about that, but you should note that I believe the district court is trying to proceed in a diligent manner in this matter. What I would like to do today, you know, obviously there were a number of counsel who spoke in the first half of the argument, and I want to respond to each of their arguments. I want to make one global point first, and then I think what I'll do is just respond in the order in which counsel appeared in the first half of the argument, obviously unless the panel has any questions that would like to divert me. But the global point is this. So it is taken as a given here, it should be taken as a given here, that Girton is binding law in this circuit. Girton involves allegations against many of the same defendants as this case, involving the same factual circumstances as this case. If anything, the allegations in this case are stronger and more extensive than in that case. And obviously the first half of the argument focused to a great extent on the defendants who weren't present before this court in that case, and I want to talk about that. Judge Merritt, let me ask you, what is the current status of the Girton case? Where is it, what's going to happen to it now? It's back from the Supreme Court, right? Yes, so exactly. This court denied en banc, the Supreme Court denied cert, the case is back in the district court for discovery. And as Mr. Kim said, I suspect the defendants will move for summary judgment. It's before the same district judge, it's before Judge Levy. And so I anticipate going forward that Judge Levy is likely to align the procedures of these cases so it's not the same litigation over and over again. But I think that's where it is. And this case is on an interlocutory appeal before this court, which could be resolved quickly and then it would be easy to consolidate them. Let me talk about the individuals who are different, if I might. So I'll start with the Snyder defendants. And former Governor Snyder, I want to correct one thing, not quite correct, but just further elaborate one thing my colleague on the other side said about former Governor Snyder and Gertin. It was the district court in Gertin who dismissed Snyder. Snyder was not before this court in Gertin. And there were different allegations against Snyder in that case than in this case, which is what the district court explained in its opinion from which the defendants have sought an interlocutory appeal. And I'll happily go through each of the allegations against former Governor Snyder that were present in this case, which demonstrate that under the analysis set forth in Gertin, the complaint against Snyder states a claim for a violation of clearly established constitutional rights. But the overall point about under the analysis set forth in Gertin is this. And I think Judge Murphy, Your Honor, with your question, kind of it hit the nail on the head in the first half of the argument, which is to say what the defendants are arguing is that Snyder couldn't have been deliberately indifferent because he was relying on the advice of experts. And what this court held in Gertin is the question of reliance on the advice of experts is a factual question not to be determined on a motion to dismiss and certainly not to be assessed on an interlocutory appeal from a motion to dismiss when factual questions are doubly verboten. Here we have lots of allegations in the complaint that specifically point to Snyder's knowledge of the risks that were likely and then were ultimately being eventuated by his conduct and of his actions that caused and extended and exacerbated the crisis. And, of course, as our 28-J letter last week pointed out, we know more now and we will seek to develop that information before the trial court, which underscores the wisdom of Gertin in suggesting we can't freeze the record as of the particular point that the complaint was filed, but even based on the complaint. What we know is Snyder's actions here began as early as the spring of 2013 when he specifically approved the switch from the clean Lake Huron water from Detroit to the new not yet operational Karaganda Water Authority. And both parties agree here that Snyder knew at least as early as June of 2013, and we allege in April of 2013 when he made the switch decision, that switching to the KWA entailed using the Flint River as a water source for at least a couple of years from mid-2014 until the end of 2016 was the plan. And, you know, there's additional information that's come out about Snyder's knowledge of the risks of using the river, which we want to develop below, but even that, so action as of April of 2013 in making the switch, at least as of June of 2013, of knowing that the Flint River is going to be used as the water source, but it doesn't stop there. In October of 2014, after a summer in which we had substantial indications of corrosion throughout the water system in Flint because of a Legionnaire's outbreak, because of a spike in lead poisoning, because of a fecal coliform infestation that Flint responded to by adding chlorides, which led to total trihalomethane contamination in the water system, a clear sign of corrosion. After the highly publicized decision of General Motors in October of 2014 to disconnect from Flint River water because it was concerned that it was corroding the parts and to disconnect from Flint's municipal water system because GM was concerned that it was corroding the pipes and parts of the plant, Snyder calls together his aides to talk about this. His aides are his top aides, his very top aides. His chief legal counsel says it's downright scary that we're using the Flint River. His senior policy advisor says we need to get back to Detroit ASAP. He dispatches his very closest aide, his so-called transformation manager, Rich Baird, to confer with the emergency manager, the then early, who reports to the governor ultimately about switching back to Detroit. And at that point they make the decision that they're going to stick with providing water from the Flint River for cost reasons. Okay, so that's a, whatever Snyder might have heard from experts, we know that he was hearing as of October of 2014 that using Flint River water was downright scary. We know that he knew about what GM had done, that he knew of other substantial indications of corrosion in the water system. Again, this is Judge Murphy, if I can just interrupt you briefly and give you just kind of the opposite view of the question I asked earlier, which is it seems like Guertin did a pretty good job of going defendant by defendant, and I give you that they rejected the idea of relying on experts was enough with respect to the emergency managers, but Guertin did dismiss the head of the MDEQ, Wyant, and Lyon, the two cabinet heads who are below Governor Snyder in some respects, and said that just information that they had knowledge was not enough, and even rejected the idea that saying Lyon engaged in a cover-up was not enough because it was conclusory, so why wasn't that part of Guertin applicable to Governor Snyder? I wonder if you could talk about that a little bit. Yeah, because there's a crucial difference between Wyant and Lyon, the division directors of MDEQ and MDHHS and Snyder himself here, and that is they had no line authority over the emergency manager where Snyder did. The emergency manager ultimately reported to Snyder, and so what this court said in Guertin about Wyant and Lyon is they didn't have any authority to take any effectual action here. There might have been a failure to act on their part, but they weren't responsible for providing the dirty water in the first place, but Snyder was because it was early who did. It was obviously Snyder who made the decision in the first place to switch to the Flint River. It was Snyder who made the decision in October of 2015 to switch back to clean Lake Huron water, and it was Snyder in October of 2014 who dispatched his top aide to talk to the person who reported to him about switching back to Detroit, and they ultimately decided not to do that. So I think there's a crucial difference there, but it doesn't stop in October of 2014, and, again, there's further information that we would like to develop in the district court about Snyder, but in January of 2015 we know Snyder is meeting with other government officials about these issues as further evidence of corrosion continues to appear very publicly. We know that, and we specifically allege that in March of 2015, Snyder meets with his aides and asks whether they should distribute water filters to the people of Flint, ultimately decides not to do that, even though by that point there is massive accumulating evidence of contamination within the water system. He gets advised in April of 2015 by his chief of staff that the Flint water system remains a potential danger flag. He learns more information throughout that summer of 2015, both from the public whistleblowers and from his own staff, and yet until October of 2015 he continues to provide Flint River water to the people of Flint. It's only when he makes the decision, again, it was his decision to switch to the Flint River in the first place, it was his decision to switch back in the end, it was only when he made the decision to switch back in October of 2015, 18 months later, that the city got off that system. This is a very different case with regard to the allegations here than in Girton, and Snyder is in a very different position. He's a high-level official. He supervises Lyon, but he had knowledge and he took action, and they couldn't take the same kind of action, so I think that's why. And the question about reliance on experts, I think it's a factual question whether it's deliberately indifferent to rely on what some people are saying when there's all this evidence of both risk and the actual eventuation of that risk staring him right in the face and staring everybody in the face. So this is Judge Murphy. I wonder if you could comment on another point. So the district court found the callousness necessary for this type of claim, both in the initial kind of decision to transfer and then in the waiting to declare for emergency funds, and those were the points that supported the idea that Governor Snyder, former Governor Snyder was engaged in conscious shocking conduct or callous indifference. But then when the district court went to the equal protection claim, the district court suggested that Governor Snyder had rational basis for these actions in rejecting the equal protection claim, and I thought there was somewhat of a disconnect there in the sense of if something is rational, it's very difficult for us to call it conscious shocking. So I know you disagree with the equal protection component of the district court's order, but I wonder if it was rational, would you say that it could drive to the level of conscious shocking behavior? Yeah, and I will emphasize that's not an appealable order. So, yes, we do continue to disagree. It's just not here because it's not an appealable order. But I guess what I'd say is, you know, the question of what's a rational basis for purposes of equal protection is the minimal rationality standard, which requires courts to indulge every possible inference in support of what the government actor might have done, including indulging post hoc rationalizations. But when we're talking about deliberate indifference and conscious shocking behavior, you know, we're talking in particular about what the actual facts were, and here the conscious shocking behavior we would submit, and I think the district court's opinion is best read this way. The conscious shocking behavior begins way before the switch back and the delay in calling the state of emergency, and the delay in calling the state of emergency may underscore that behavior, may be really important, actually, for the ex parte young claim, which I want to get to. But it has a very different role here than it might under the equal protection claim. So if I might, I would like to move on to Dylan because I see, you know, my time ticking away and many defendants to talk about, although I'm happy to answer any questions. As for Dylan, I just want to say a couple of things. First of all, the plaintiffs would believe that the appropriate thing for this court to do is to remand to the district court for further consideration of its earlier opinion in light of its Brown opinion. We were not counsel in Brown. We did not have an opportunity to brief the issue in Brown. And so, you know, we need to have that opportunity. I will say the fact that Dylan wasn't the treasurer anymore at the time that the switch was actually accomplished in April of 2014, our position is might well go to apportioning liability, figuring out what the damages are. But it was Dylan who specifically advised Snyder that he should make the change to the Flint River, even though Dylan, for the reasons that we've articulated in the brief, knew substantial information that the Flint River was not an appropriate water source, both on water quality grounds but also on cost grounds. But again, and had that decision not been made, we would not be here today. So I think whether or not Dylan was there in April of 2014 is less relevant, and we would like to make that case to the district court, particularly in light of the further information about Dylan that's also emerged from the Attorney General's own investigative files and its criminal action, which we would like to develop further. But, you know, for this court's purposes, I think we would agree with the defendants that a remand is appropriate. Let's see. Let me turn to – I don't know that I have anything more to say about the clearly established question as to Snyder and Dylan beyond what I've said, except that I think that my colleague, Ms. Bettenhausen, might be confusing a fact question and a law question here. So Ms. Bettenhausen says correctly, the question is, is there fair warning? Gerten establishes there's fair warning that deliberate indifference in this context is unconstitutional. The question is, do the allegations make out a claim of deliberate indifference? I just went through the allegations against Snyder. We believe it's a factual question whether those allegations or Snyder's response in briefing and in argument that he was relying on experts, which of those a trier fact should believe, and they should be tested in discovery. As to Ex Parte Young, so a couple of points. First of all, I heard my colleague acknowledge that the Ex Parte Young question is disconnected from whether there's a claim against Snyder himself, a personal capacity claim against Snyder himself. And I want to underscore that, you know, and just make the argument affirmatively in response to the question that Judge Moore had asked, that there is no particular connection between them. Ex Parte Young is the vehicle by which individuals who have been harmed by the state can force the state going forward to do things to fix the harm and put them in the position they would rightfully have been in absent the action taken by, absent a constitutional violation. And so here, whether Snyder personally committed the constitutional violation or the state committed the constitutional violation, Ex Parte Young is the vehicle to get a change in the future that fixes the problem. And I want to say two things about Ex Parte Young on the merits. One is this case is exactly Millikin 2. If you look at the very first paragraph of Chief Justice Berger's opinion for the court in Millikin 2, what the court says is the question presented is whether a district court can, as part of a desegregation degree, order compensatory or remedial educational programs for school children who have been subjected to past acts of desegregation. Okay, past acts of desegregation. So the court in Millikin, in the very first paragraph, acknowledged that this was about providing a prospective remedy to eliminate the ongoing effects of a past violation of the Constitution. And ongoing effects, which my colleague on the other side says is what we're seeking to overcome here, is precisely the language this court used in the Bowler case in upholding an Ex Parte Young claim using exactly the same language. And it's exactly the same language in the request for relief. And the reason why it's exactly the same language in the request for relief is because this case, the In Re Flint Water cases case, folded in the case maze that made the request for relief that was upheld in the Bowler case. Green v. Mansour, which is what my colleague says is her best case, is very different than this case. Green v. Mansour was a welfare rights case, about AFDC in Michigan. And what the Supreme Court said in Justice Rehnquist's opinion was that notice relief, where all it's doing is enabling people to get money from the state that they were owed in the past, is not something that is consistent with the 11th Amendment. It's not prospective. That the line of taking money from the state's pocket and giving it to the injured person directly versus requiring the state to do and perhaps pay for some action going forward that's going to fix the underlying problem, that's the line in Millikin 2. That's the line this court applied in Bowler, and that's the line this court applied in Gary B. just last week, and the language on Millikin 2. And, you know, obviously there was a dissent from Judge Murphy in Gary B. on the merits. There was no dissent on the Millikin 2 question and on the 11th Amendment question in the Gary B. case. And the line was exactly as I just stated. So as to the claims against Snyder in his individual capacity and as to the claims against the sitting governor in her official capacity, we believe that the claim should be upheld, that the judgment should be affirmed, the judgment as to Dillon should be remanded for reconsideration so we have a chance to get our day in court on the new analysis that the district court provided in the separate case. Let me turn to Cook very briefly. So I want to talk about Cook and Rosenthal. Cook, there is, so what my colleague on the other side arguing for Cook says is, well, he acknowledged that Flint was not using corrosion control, and that's correct. Two months after Bush lied to the EPA and told the EPA that Flint was using corrosion control, what Cook said is, well, we're not using corrosion control, but we don't have to use corrosion control. And the misleading part of it is whether they had to use corrosion control. And there are two components to that, right? One has to do with this misinterpretation, supposed misinterpretation of the Lenny Copper rule and whether that was a good faith misinterpretation or whether that was a misinterpretation that was actually a misinterpretation or whether it was just misleading is really a matter of fact to be determined by a trier fact after an opportunity to test Cook's assertion that he was acting in pure good faith. But that's not the only thing that made it misleading. The other thing that made it misleading is that Cook's assertion that they didn't need to use corrosion control was based on lead tests in the city of Flint that undercounted the amount of lead because there was flushing, as Judge Murphy pointed out, before collecting the samples and also because they didn't collect lead from the highest risk places. And so, again, you know, these are muddy factual matters, and that's exactly why they should be determined after discovery and not on the basis of a motion to dismiss. As for Rosenthal, everything I heard my colleague on the other side say about Rosenthal was an argument about the facts. It was an argument about whether Rosenthal was just doing his job or not. And, you know, you heard a lot about, well, he just removed high lead levels because they should have been removed, because they were in violation of protocols. They were from areas that shouldn't be tested. So here's what we would seek to prove below, which is a different spin on the story, which we believe is correct, the true spin on the story. What the city of Flint did is it collected lead readings from 71 different locations in the city. They were supposed to have 100. They only collected 71. When Bush and Prisby and Rosenthal were presented by Glasgow with those lead readings, what they did, and once they looked at those lead readings, the 71 locations aggregated together, put the city over, that is failing, the action level for lead that the EPA establishes. But once they removed the two most, the two highest lead readings from those 71, so it goes from 71 to 69, they just squeaked under the action level for lead. Now, the crucial point here is that, you know, whether or not those two readings should have been taken because they were taken from the correct places, Rosenthal and Bush and Prisby never undertook any effort to go through the rest of the 71 to see whether those were taken from improper places. And, of course, if they'd knocked out some that were at the bottom, that would have raised the risk, or, you know, raised the reading. But in any event, these are all factual issues that need to be determined before a trier of fact. As Rosenthal points out, as Rosenthal's counsel points out, he has been deposed about this in actions proceeding against other defendants. There's really no reason not to let the district judge actually assess the factual arguments here. Let me talk about the two Flint defendants who were not before the court in the Girton case. So, Doherty Johnson, utility supervisor for the city of Flint. This is not a case, as my colleague argues, of guilt by association. There are two specific allegations with regard to Johnson, both of which are inconsistent with the idea that he was merely relying on land or otherwise, you know, didn't know what the nature of the problem was. So one specific allegation against Johnson, which we talk about at page 11 of our brief, we cite the relevant complaint pages in our brief at page 11, is that as the time for the switch was approaching in April of 2014, it was Glasgow, who I'll talk about in a second, Glasgow who was sounding the alarm bell saying our water treatment plant isn't ready. And remember, when land had been involved in the past, when the engineering company defendants had been involved in the past, what they said was, yeah, you could use the Flint River as a water source, but only if you make $69 million worth of improvements to the Flint water treatment plant. And what Glasgow was telling his supervisors, including Johnson, including Croft, including Early, was this plant isn't ready. And if this happens, he tells the NDEQ officials, if this happens next week, it's going to be over my objections, but management have their own agenda. And Glasgow later testifies in separate proceedings than these, that Johnson and Croft specifically pressured him to make the switch, even though he was specifically advising them that the plant wasn't ready, that to the extent they were relying on the engineering company defendants, who said it would be okay to use Flint River water, that was based on a particular condition that was not being satisfied. And so when Johnson, in the face of Glasgow warning him that actually you can't rely on the engineering company defendants, now says, I don't care, do it anyway. And of course, Johnson is a supervisor of Glasgow, so Johnson has the power over him. This is an action that played a key role in causing the crisis. And the second independent allegation against Johnson, which again is not built by association, is that in the spring of 2015, when the Genesee County Health Department was trying to figure out what was going on with the spiking Legionnaires cases and trying to figure out whether there was some connection to the change in water source, it was Johnson who sat on a FOIA request and said he would get to it and ultimately didn't get to it. Now I heard Johnson's attorney say, well, there's no reason to think that he knew that there was a problem in delaying on this request. That's exactly the kind of factual argument he should present to a trier of fact after it has an opportunity to be tested and discovered. It's not the kind of argument that should be made. It's not the kind of thing that should be asserted by counsel, certainly not in an appellate argument, and certainly not in an interlocutory appeal from a denial of a motion to dismiss on qualified immunity grounds. And so, you know, with regard to all of these defendants, the defendants make various causation arguments. But, of course, all these causation arguments are as well factual. And, you know, this was a case. This was a water crisis that was caused and extended and exacerbated due to the actions of multiple individuals. We can point to knowledge and culpable actions as to each of the defendants who were here, which we believe were required to do under Girton, and we have done. But even Girton itself recognized that you don't have to, for 1983 purposes, show that any one defendant was the reason why the plaintiff class got injured, right? Because, of course, the court upheld claims against multiple of the defendants who were before this court today, even though, you know, when Bush lied to the EPA in February of 2015, that extended the crisis, but there were other things that extended it later. These are really questions about how to apportion liability once we have findings of fact. But let me get to Glasgow. I wonder if you could just briefly talk about Glasgow's finished the last defendant. I mean, you just told a pretty good case for why he shouldn't be liable here, because he was trying to, in some respects, blow the whistle, but his bosses essentially pressured him, which, I mean, it's a pretty high standard shocking the conscious. Is this conscious shocking for when he's actually trying to do something to stop the problem, and his bosses tell him, and he just goes along, I suppose, would be the theory. So why don't you, if you don't mind, spend a little time on that. Absolutely. Very happy to, Judge Murphy. Thank you. Yeah, and so with respect to Glasgow, I want to make clear that we do not allege and we do not argue that Glasgow's actions in April of 2014 at the moment of the switch were deliberately indifferent or conscious shocking. And, in fact, as Your Honor points out and as Glasgow's attorney points out, throughout the course of the crisis from April of 2014, for many months, you see Glasgow actually trying hard to address the problem or to at least call people's attention to the problem. So our point, our concern about Glasgow, and the reason why the court upheld the claim against Glasgow here but not in the Girton case, and it was the same district judge in Girton as here, is that in the summer of 2015, that crucial summer of 2015, when pressure is increasing all around on all of these defendants because Del Toro has issued his memorandum that got widely publicized in the state that there's lead poisoning, at least there's lead contamination, very likely in the water system when Mark Edwards is saying, who came from Virginia Tech, is saying, look, there's lead contamination. In fact, it's not just theoretical. And then, of course, we're going to get to Dr. Monahan and Atisha just a month later saying actually the lead is in the bodies of kids in Flint. During that summer, when they're going through the latest round of lead tests, which I was just talking about with regard to Rosenthal, Bush and Prisby and Rosenthal, who work for the NDEQ, go to Glasgow, who is the person responsible for water quality for the city of Flint at the water treatment plant. So he doesn't work for them. And they direct him to remove the highest lead levels. And I've just talked about the complicated facts there that we need to work out in the district court. But because Glasgow, unlike when he was in April of 2014 pushing back against his superiors and his superiors said do it anyway, because Glasgow did not work for any of the people at NDEQ, his going along with this, going along with changing lead levels to suppress to the public and to regulators what the nature of the lead problem is, that action was deliberately indifferent. And this court has established that when there's time to deliberate, and he certainly knew of the risks. We know he knew of the risks. So it's paragraph 273 of the complaint that shows that he did knuckle under to the people who didn't actually supervise him at that point. And it's paragraph 267 of the complaint that shows that Glasgow specifically knew of the risks that were occurring to the people of Flint at that point because of the potential of lead in the water, the likelihood of lead in the water that was discovered precisely because he said let's test Leanne Walter's house and found a lead level of over 100 parts per billion in that house even though, you know, the action level for lead is 15 parts per billion. So that's the basis on which we seek to hold Glasgow liable. You know, I would agree if we're apportioning liability here, you know, that he's in a different place than the other defendants, but he did take action knowing full well of the risks, and he took action that was deceptive. Now if he wants to make arguments about why he couldn't help but go along, then those are arguments to be made before a trier fact and to be tested in discovery, and we'd be happy to proceed on that and obviously accept the resolution whichever way it goes. And those are essentially, Your Honor, the points that I wanted to make about the specific defendants before the court. I do want to emphasize all of the other defendants. So my colleague who represents the MDEQ defendants, most of the MDEQ defendants, said you should look carefully at what the court held in Girton versus what the allegations are against the MDEQ defendants here, and I would encourage you to look carefully at that because what you'll find, as we detail in our brief, is that the allegations against the MDEQ defendants are either the same as in Girton, the allegations against Werfel, for example, are precisely the same as the allegations in Girton. My colleague would like to distinguish Girton with regard to Werfel. There's no distinction because we make exactly the same allegations here as the plaintiffs did there. Or in other cases, even stronger. For example, with regard to defendant Schechter-Smith, where we specifically have allegations that Schechter-Smith played a key role at two crucial moments in the crisis. First, in securing the administrative consent order that purported to require the city to use Flint River water. And secondly, in the spring of 2015, in covering up the connection between the water source switch and the Legionella outbreak, when the Genesee County Health Department is asking, hey, this seems to us really suspicious that we had a change in the water source and then we had a Legionella outbreak. Schechter-Smith, who's in charge of the relevant division about drinking water and municipal assistance, sends an internal email to her staff which says, you know, actually the change in the water source might have created the conditions for the spread of Legionella. She had already sent internal emails saying, I think there might be corrosion all across the Flint water system. And yet, she approves her office sending out a response to the Genesee County Health Department that says that there's no connection between the change in the Flint River or the Flint water treatment plant and the Legionella outbreak. And this is not what the court relied on in Girton. It's stronger. And I think as you go through, we have stronger allegations against Bush as well in paragraph 273 where he directed removing the highest lead levels from water quality reports. That was not information on which the court relied in Girton. So, yes, I would encourage your honors to compare what the court held in Girton with regard to the defendants who are common defendants with what we allege in our complaint, which we try to discuss in detail in our brief. Obviously, it's a big, massive case. You know, the complaint in Girton, I think, was 89 pages. The complaint here is over 200. So, obviously, we're not going to get to every little detail in our brief. But I think if you do this, I think you'll see that, actually, this case is an a force URI from Girton. Girton is binding. This court denied en banc. The Supreme Court denied cert. And Girton applies a force URI here. In this case, just as in Girton, we have defendants who exemplified what the court said in the county of Sacramento versus Lewis, which is when extended opportunities to do better are paired with a protracted failure even to care. Indifference is truly shocking. This was conscious shocking behavior. We should have an opportunity to develop our claims in the district court, have them tested by discovery, and then assessed at the next stage of the litigation and not squelch here on a motion to dismiss. If the panel has further questions, I'm happy to entertain them. Otherwise, I'm also happy to submit on that argument. Any further questions from the judges? No. No. Thank you very much. Thank you. We have a couple of court rebuttals. Yes, Your Honor. I believe Ms. Bettenhausen is first for three minutes. Thank you. This is Margaret Bettenhausen again. I just want to touch on a few points that Mr. Wagenstos brought up first. He argued that Governor Snyder should be held liable because he had authority over the emergency managers, but we know that there is no respondeat superior liability under 1983. So Snyder can't be held liable for the EM's conduct simply because he had some sort of authority over them. Nor can he be held liable for anyone else's conduct, which is why we rely on the Girton opinion. Like Wyatt and Lyon in that opinion, he cannot be held liable for the conduct of others. Mr. Wagenstos also stressed that he wants more factual development here to determine what Snyder knew and when. We are accepting the facts as alleged, that Snyder was aware of issues with the water, that his staff was discussing and worried about what was going on in Flint. We are not disputing that. What we're saying is that basically, if you look at the clearly established framework, he would have had to, you know, under a law clearly established when every reasonable official would know what they were doing would violate the right. So he would have had to know that disregarding the input of the experts closest to the issues would be the only way to avoid constitutional liability. That simply can't be correct. So to put the allegations together, and that's why we're saying this isn't substantively different than it was in Girton, they also discussed this competing information that was out there. So that just shows sometimes these high-ranking officials are put in these impossible situations where they have to make a choice. And what Mr. Wagenstos is really asking you to do when he's saying, let's do some more factual development, is to go back and second guess with the benefit of hindsight whether the former governor made a good decision or not. But that is not the purpose of substantive due process to fix bad decisions. And just quickly, he focused on a specific word in the Milliken decision about past, but he ignores what actually happened in Milliken. In Milliken, there was an order entered to stop the segregation that was ongoing in the Detroit public schools. There was an ongoing violation of the law. So what the court held is when you enter that order, you can also address the past effects from that violation because it was ongoing. There are a lot of past unconstitutional conduct out there that have ongoing effects today. The fact is without an ongoing violation as of today, the court is simply without authority to enter ex parte young relief. And for these reasons, I see I'm out of time. We respectfully ask the court to reverse. Thank you. Thank you. Mr. Barbieri, you have two minutes. Mr. Barbieri. Yes, I'm here. Sorry. Go ahead. Very briefly. I'm responding in connection with the arguments regarding MDQ defendant cook. Notwithstanding the suggestion that there needs to be factual attention here. I believe that on the basis of what is alleged in the carton case, it is not sufficient to show conscious shocking conduct. The most that the council now suggests is, is that there is a suggestion that somehow defendant cook misled Mr. Del Toro. He dismisses the idea that it was only on the basis of a difference in interpretation, but by citing the actual lead results that were obtained in Flint, those same allegations were actually made in the Gerten case. And we're not found by that district court judges made the decision here to be sufficient to suggest that there is conscious shocking conduct. The judge didn't find it in Gerten, but somehow finds it here on even a left flimsy allegation that has no factual support. I submit it's implausible to suggest that Mr. Cook misled Miguel Del Toro, the U S E P employee by either citing his view about a different interpretation, which is more than just good faith that was deemed to be a reasonable interpretation. And further by the fact that the sites, the lead results, those lead results were actually included in the Gerten case. We're not found to be sufficient for the same reasons here. The district court should have found, and we're requesting this court to reverse the conclusion that he engaged in conscious shocking conduct for the remainder. I rely on and rest on our briefs. Thank you. Thank you. Mr. Zane. I believe you have one minute. Yes. Thank you. Without you can never get to substance without addressing procedure. And what the plans are attempting to do is circumvent the procedure requirements that you have a properly fled complaint that sufficiently lays out a right to relief. That's beyond just possibility and causation is not. Yes. There's a question of fact and causation, but you have to initially please it as an element of the claim. And they blatantly failed to do that. That's a challenge that's defeated in procedural grounds, a question of law there. The plaintiff's attempting to make it a factual question. We're very clearly saying it's not properly pled causation, being a glaring deficiency specifically as it relates to the allegation. I encourage the panel to review paragraph 129. Plaintiff alleges that that's a paragraph which Glasgow sounding the bell, sounding the bell to MDQ. There's no allegation. He sounded the bell to the city of Flint or that. And that's specifically what he's sounding the bell regarding was staffing issues. Thank you. Thank you. I believe that we have heard from everybody in full. And if that is the case, not hearing any objections to that statement from any, any lawyer or judge, I thank all of the lawyers for your thoughtful argument. And the case will be submitted. And you may disconnect to your instructions from the perks office and our IT staff. Thank you. Thank you, Your Honor. Thank you. Thank you.